No. 24-3568

IN THE

# United States Court of Appeals for the Ninth Circuit

JAMES EVERETT HUNT; JUAN RODRIGUEZ; KURT VOUTAZ; JOEL
WHITE; ANDREW AUSTIN; SCOTT KLINE; RYAN FISHMAN,
*Plaintiffs-Appellants*,

*v.*

PRICEWATERHOUSECOOPERS LLP (PWC),
*Defendant-Appellee*,

*and*

BLOOM ENERGY CORPORATION, J.P. MORGAN SECURITIES LLC,
MORGAN STANLEY SMITH BARNEY LLC, CREDIT SUISSE
SECURITIES (USA) LLC, KEYBANC CAPITAL MARKETS INC.,
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,
ROBERT W. BAIRD & CO. INCORPORATED, COWEN AND
COMPANY, LLC, HSBC SECURITIES (USA) INC., OPPENHEIMER
& CO. INC., RAYMOND JAMES & ASSOCIATES, INC.,
*Defendants.*

On Appeal from the United States District Court
for the Northern District of California
No. 4:19-cv-02935-HSG
Hon. Haywood S. Gilliam

## RESPONSE BRIEF FOR
## PRICEWATERHOUSECOOPERS LLP (PWC)

Edward Williams
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037

E. Joshua Rosenkranz
Eliza Lehner
Jodie C. Liu
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Counsel for Defendant-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee PricewaterhouseCoopers LLP ("PwC") discloses that it is a limited liability partnership registered under the laws of Delaware, with no parent corporation, and no publicly held corporation owns stock in PwC.

Date: November 25, 2024

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ E. Joshua Rosenkranz*

E. Joshua Rosenkranz
*Counsel for Defendant-Appellee*

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT .............................................i

TABLE OF AUTHORITIES ..................................................................iv

STATEMENT OF JURISDICTION ......................................................... 1

ISSUES PRESENTED ........................................................................... 1

INTRODUCTION .................................................................................. 1

STATEMENT OF THE CASE ............................................................... 5

    Legal Background ........................................................................... 5

    Bloom Energy Goes Public In 2018 ................................................ 7

    Bloom Energy Later Revises 2016 And 2017 Financial
        Statements And Restates 2018 And 2019 ............................. 9

    Plaintiffs Sue Numerous Entities Involved In Bloom
        Energy's Public Offering ...................................................... 12

    The District Court Grants PwC's Motion To Dismiss ................... 16

SUMMARY OF THE ARGUMENT ...................................................... 20

ARGUMENT ...................................................................................... 25

    I.    Section 11(a)(4) Does Not Impose Strict Liability On
        Accountants For The Issuer's Financial Statements. .......... 25

        A.    The Act's text and interpreting regulations limit
            PwC's liability to what it "certified"—its audit
            opinion. ....................................................................... 26

        B.    *Omnicare* and Section 11 caselaw reject Plaintiffs'
            "certification" theory. ................................................... 38

    II.    The Challenged Line-Items In Bloom Energy's
        Financial Statements Are Inactionable Opinions. ............... 47

        A.    The challenged line-items are inactionable
            opinions based on highly subjective assessments
            of Energy Servers' useful life. ..................................... 48

1. Numerical line-items can be opinions when based on inherently subjective accounting judgments............................................................. 49

2. The challenged line-items are opinions because they require complex and subjective accounting judgments. .......................................57

B. The revisions to the line-items were not material. .....61

CONCLUSION ................................................................................... 73

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
  No. 17-CV-1545, 2019 WL 4257110 (S.D.N.Y.
  Sept. 9, 2019) ................................................................. 50, 53, 54, 55

*In re Atossa Genetics Inc. Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017).................................................. 61, 71, 73

*Bily v. Arthur Young & Co.*,
  3 Cal. 4th 370 (1992).................................................................. 34, 35

*Broam v. Bogan*,
  320 F.3d 1023 (9th Cir. 2003).......................................................... 65

*Chapman v. Mueller Water Prods., Inc.*,
  No. 19-cv-3260, 2020 WL 3100243 (S.D.N.Y.
  June 11, 2020)................................................................................ 53

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009) ................................................. 34, 43

*City of Dearborn Heights Act 345 Police & Fire Ret.*
  *Sys. v. Align Tech., Inc.*,
  65 F. Supp. 3d 840 (N.D. Cal. 2014)............................................ 52, 55

*City of Dearborn Heights Act 345 Police & Fire Ret.*
  *Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017)............................................ 40, 52, 53, 56

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010)......................................................... 62

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005)......................................................... 57

*Deephaven Priv. Placement Trading, Ltd. v. Grant Thornton & Co.*,
    454 F.3d 1168 (10th Cir. 2006) ........................................ 30, 33, 34, 47

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023) ............................................................ 62

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ................................................. 64, 66, 69

*Fait v. Regions Financial Corp.*,
    655 F.3d 105 (2d Cir. 2011) ................................................. 52, 53, 55

*Fehribach v. Ernst & Young LLP*,
    493 F.3d 905 (7th Cir. 2007) ............................................................ 30

*Food Mktg. Inst. v. Argus Leader Media*,
    588 U.S. 427 (2019) ........................................................................ 36

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010) ........................................................................ 29

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ............................................................ 72

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ........................................................................ 61

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ........................................................................ 55

*Hutchison v. Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011) ....................................................... 68, 69

*IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*,
    783 F.3d 383 (2d Cir. 2015) ....................................................... 64, 67

*In re Ikon Office Sols., Inc.*,
    277 F.3d 658 (3d Cir. 2002) ....................................................... 32, 33

*Johnson v. CBD Energy Ltd.*,
No. CV H-15-1668, 2016 WL 3654657 (S.D. Tex.
July 6, 2016) ..................................................................... 43

*Knox v. Yingli Green Energy Holding Co.*,
242 F. Supp. 3d 950 (C.D. Cal. 2017) ............................... 72

*In re Lehman Bros. Sec. & ERISA Litig.*,
131 F. Supp. 3d 241 (S.D.N.Y. 2015) ................................ 44

*McCormick v. Fund Am. Cos.*,
26 F.3d 869 (9th Cir. 1994) ............................................... 70

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
No. 19 CIV. 7536, 2021 WL 1199035 (S.D.N.Y.
Mar. 30, 2021) ................................................................... 65

*Monroe v. Hughes*,
31 F.3d 772 (9th Cir. 1994) ............................................... 27

*New England Carpenters Guaranteed Annuity & Pension*
*Funds v. DeCarlo*,
__ F.4th __, 2023 WL 11965444 (2d Cir. 2023) ........... 50, 54

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*
*Pension Fund*,
575 U.S. 175 (2015) ....................... 1, 4, 6, 22, 38, 39, 40, 41, 49, 61

*Ortiz v. Canopy Growth Corp.*,
537 F. Supp. 3d 621 (D.N.J. 2021) ......................... 50, 53, 54

*In re OSG Sec. Litig.*,
971 F. Supp. 2d 387 (S.D.N.Y. 2013) ........................... 41, 45

*Pirnik v. Fiat Chrysler Autos., N.V.*,
No. 15-CV-7199, 2016 WL 5818590 (S.D.N.Y.
Oct. 5, 2016) ..................................................................... 53

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
135 F. Supp. 3d 145 (S.D.N.Y. 2015) ................................ 65

*Provenz v. Miller,*
102 F.3d 1478 (9th Cir. 1996) ............................................................ 57

*Querub v. Hong Kong,*
649 F. App'x 55 (2d Cir. 2016) ................................................. 22, 38, 45

*SEC v. Jensen,*
835 F.3d 1100 (9th Cir. 2016) ............................................................ 64

*SEC v. Todd,*
642 F.3d 1207 (9th Cir. 2011) ............................................................ 57

*Shalala v. Guernsey Mem'l Hosp.,*
514 U.S. 87 (1995) ............................................................................ 35

*In re Software Toolworks Inc.,*
50 F.3d 615 (9th Cir. 1994) ......................................................... 45, 56

*Special Situations Fund III QP, L.P. v. Marrone Bio*
*Innovations, Inc.,*
243 F. Supp. 3d 1109 (E.D. Cal. 2017) .............................................. 44

*In re Stac Elecs. Sec. Litig.,*
89 F.3d 1399 (9th Cir. 1996) ....................................................... 62, 72

*In re SunEdison, Inc. Sec. Litig.,*
300 F. Supp. 3d 444 (S.D.N.Y. 2018) ................................................ 27

*Thor Power Tool Co. v. Comm'r,*
439 U.S. 522 (1979) ..................................................................... 35, 55

*United States v. Arthur Young & Co.,*
465 U.S. 805 (1984) ............................................................. 31, 35, 46

*United States v. Hawkins,*
No. CR 04-106, 2005 WL 1660984 (N.D. Cal.
July 11, 2005) .................................................................................... 73

*In re Velti PLC Sec. Litig.,*
No. 13-CV-03889-WHO, 2015 WL 5736589 (N.D. Cal.
Oct. 1, 2015) ..................................................................................... 43

*In re Worlds of Wonder Sec. Litig.*,
  814 F. Supp. 850 (N.D. Cal. 1993) .................................................... 46

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) .................................................... 45, 46, 56

*Xu v. Gridsum Holding Inc.*,
  No. 18 Civ. 3655, 2020 WL 1508748 (S.D.N.Y.
  Mar. 30, 2020) .................................................................................... 62

*Yaroni v. Pintec Tech. Holdings Ltd.*,
  600 F. Supp. 3d 385 (S.D.N.Y. 2022) .................................................... 68

## Statutes

15 U.S.C. § 77d(d)(3)(K) .................................................................... 28

15 U.S.C. § 77k ................................................................................ 5

15 U.S.C. § 77k(a) ........................................................................ 5, 61

15 U.S.C. § 77k(a)(1) .................................................................. 27, 28

15 U.S.C. § 77k(a)(3) ........................................................................ 27

15 U.S.C. § 77k(a)(4) .............................................. 5, 21, 26, 28, 32, 61

15 U.S.C. § 77k(b)(3) ........................................................................ 41

15 U.S.C. § 77aa(25) ........................................................................ 36

15 U.S.C. § 78s(b) ............................................................................ 29

15 U.S.C. § 7213(a)(3)(B) .................................................................. 28

## Regulations

17 C.F.R. § 210.1–01 ........................................................................ 55

17 C.F.R. § 210.1–02(f) .................................................. 3, 21, 29, 32, 39

17 C.F.R. § 210.2-01(c)(4)(i) ............................................................ 29

17 C.F.R. § 229.10 ..................................................................... 55

17 C.F.R. § 230.405 ..................................... 3, 6, 21, 29, 32, 37, 39

PCAOB AS 1001.03 .......................................................... 21, 30, 36

PCAOB AS 1015.10 ........................................................ 30, 36, 37, 39

PCAOB AS 1015.11 ................................................................ 31, 36

PCAOB AS 1105.04 ..................................................................... 31

PCAOB AS 1105.22 ..................................................................... 31

PCAOB AS 2810.02 ............................................................... 31, 36

PCAOB AS 4101.01 ............................................................... 30, 36

## Other Authorities

Alvin A. Arens, et al., *Auditing and Assurance Services* (16th
    ed. 2017) .................................................................... 30

Rebecca Newman & Ilan Noy, *The Global Costs of Extreme
    Weather that are Attributable to Climate Change*, Nature
    Communications (2023) ....................................................... 51

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg.
    45,150 (Aug. 19, 1999) ................................... 64, 66, 67, 69

SEC Staff Accounting Bulletin No. 108, 71 Fed. Reg.
    54,580 (Sept. 18, 2006) ........................................... 11, 69

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 15 U.S.C. § 77v(a), and 28 U.S.C. §§ 1331, 1337(a).  This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether the district court correctly held that Section 11(a)(4) of the Securities Act of 1933, 15 U.S.C. § 77k(a)(4), holds independent auditors responsible only for the statements they make in their audit opinions and not for financial statements the issuer prepared?

2. Whether the district court correctly held that the challenged errors in three line-items of Bloom Energy's financial statements are opinions, not statements of fact, because they depend on inherently subjective considerations?

3. Whether line-item revisions of 5% or less were immaterial, where changes that small are presumptively immaterial and Plaintiffs pled no countervailing qualitative facts?

## INTRODUCTION

The district court correctly dismissed Plaintiffs' claim under Section 11 of the Securities Act against PricewaterhouseCoopers LLP ("PwC"), with leave to amend.  Knowing that nothing they might allege

1

could ever satisfy settled liability rules, Plaintiffs declined to amend their complaint. Instead, they ask this Court to expand auditor liability in a way that no court of appeals has done in the 90-year history of the Securities Act of 1933 ("the Act"), and to override the distinction the Supreme Court drew between actionable facts and nonactionable opinions in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015).

In the proceedings below, Plaintiffs argued that PwC was liable for *its* statement—an unqualified audit opinion for Bloom Energy's 2017 financial statements, which was included in the company's 2018 Registration Statement. Faithfully applying *Omnicare*'s rule that opinions are inactionable except in three narrow circumstances, the district court held that Plaintiffs failed to plead any exception sufficiently. In an attempt to circumvent *Omnicare*, Plaintiffs now abandon their challenge to PwC's audit opinion and instead seek to hold PwC strictly liable for statements it did not make: three line-items in *Bloom Energy's* 2017 financial statements. That argument depends on the novel and radical theory that Section 11 makes an outside auditor

strictly liable for what an issuer says in its registration statement, even if the auditor neither made nor guaranteed the statement.

That is an insurmountable hurdle—the first of three that Plaintiffs must clear to overturn the dismissal. No circuit has ever read the Act that way, and this Court should not be the first. Plaintiffs' assertion that an outside auditor "certifies" the accuracy of an issuer's financial statements conflicts with Section 11's text, regulations interpreting that provision, and Supreme Court precedent. The Act understandably treats outside auditors differently from issuers. It holds outside auditors liable for what *they* "certify," not for every statement *the issuer* makes. Regulations define "certif[y]" to mean "express[ing]" an "opinion"—namely, the audit opinion, which is the only statement the auditor makes. 17 C.F.R. §§ 230.405, 210.1–02(f). And *Omnicare* immunizes opinions from liability where a plaintiff cannot sufficiently plead an exception, as Plaintiffs concede they cannot.

Reading the Act to put the auditor in the issuer's shoes would drastically change the role of auditors far beyond the Act's carefully constructed and time-tested limits. The auditor's function is to conduct analyses and run procedures sufficient to reach reasonable assurance

3

that the issuer's financial statements reasonably comply with relevant laws and generally accepted accounting principles ("GAAP"). Auditors do not provide absolute assurance—they cannot guarantee the accuracy of every line-item in the issuer's financial statements. PwC's one-page audit opinion contains the only statements PwC made in Bloom Energy's Registration Statement. Since Plaintiffs do not challenge the district court's holding that they failed to plead that PwC was liable under *Omnicare* for any of those statements, this Court should affirm the dismissal.

The second insurmountable hurdle that Plaintiffs confront is the district court's conclusion that the challenged statements in the Registration Statement are themselves inactionable opinions. Plaintiffs try to overcome the district court's forfeiture ruling by falsely portraying a passage in their complaint. They then seek another unprecedented holding—that just because a statement is expressed in numerical terms, it cannot reflect an opinion. That is contrary to both *Omnicare*'s basic logic and multiple precedents—including this Court's—interpreting *Omnicare* to treat numerical amounts as opinions

when they are based on inherently subjective judgments, as the challenged line-items are here.

The third insurmountable hurdle is an alternative ground for affirmance: The targeted statements are not material as a matter of law. They reflect variations of 5% or less, which regulations treat as presumptively immaterial, and did not change the total mix of information that the Registration Statement presented to investors.

## STATEMENT OF THE CASE

### *Legal Background*

The Securities Act "protects investors by ensuring that companies issuing securities … make a 'full and fair disclosure of information' relevant to a public offering." *Omnicare*, 575 U.S. at 178. The part of the Act at issue here, Section 11, codified at 15 U.S.C. § 77k, imposes civil liability for materially false registration statements. Specifically, Section 11 allows investors to sue where "any part of the registration statement … contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).

5

Section 11 specifies five categories of parties an investor may sue for the material misstatement. *Id.* § 77k(a)(1)-(5). The only category at issue here allows a plaintiff to sue "every accountant, … or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement." *Id.* § 77k(a)(4). However, unlike the other categories of parties who may be sued under Section 11 for *any* material misstatement, this category permits suit only as to "the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by" the accountant. *Id.* Plaintiffs here do not claim that PwC "prepared" Bloom Energy's financial statements; Bloom Energy undisputedly prepared and is responsible for its financial statements. Plaintiffs claim only that PwC "certified" them. The Act's implementing regulations define the term "certified" to mean "examined and reported upon with an opinion expressed by an independent public or certified public accountant." 17 C.F.R. § 230.405. That the implementing regulations themselves define the term "certified" as

6

providing an "opinion" is significant because opinions are generally not actionable under Section 11.

Under *Omnicare*, "a sincere statement of pure opinion is not an 'untrue statement of material fact,'" and therefore is not actionable under Section 11, "regardless whether an investor can ultimately prove the belief wrong." 575 U.S. at 186. The Supreme Court recognized three narrow exceptions to that general rule: (1) when the opinion is both subjectively and objectively false (i.e., it is false and the speaker knows it is false); (2) when the opinion contains embedded statements of fact; and (3) when the opinion is misleading because it omits material facts. *Id.* at 182-95.

### *Bloom Energy Goes Public In 2018*

Bloom Energy manufactures fuel-cell servers—referred to as Energy Servers—that convert natural gas or biogas into electricity. 3ER 421, 427. In July 2018, it went public, conducting an IPO and filing its Registration Statement with the SEC. 3ER 428-29. In preparing the various requisite materials for the IPO, Bloom Energy engaged PwC as an outside auditor to audit its 2016 and 2017 financial statements. 3ER 426 ¶35; 2ER 313.

7

Among the many extensive items and disclosures required by law, the Registration Statement included the financial statements Bloom Energy prepared for 2016, 2017, and the first quarter of 2018. 2ER 314-38; 3ER 340-77; *see* SER 219 ("Bloom Energy's financial statements[] prepared by the Company"). The Registration Statement also included PwC's audit opinion (entitled "Report of Independent Registered Public Accounting Firm") of Bloom Energy's 2016 and 2017 financial statements. 2ER 313.

As is standard, PwC's audit opinion (sometimes also referred to as an audit report) was one page long. *Id.* The report explained that the "consolidated financial statements are the responsibility of [Bloom Energy's] management." *Id.* It emphasized that PwC's sole "responsibility [was] to express an opinion on [Bloom Energy's] consolidated financial statements based on [its] audits." *Id.* Those audits included, for instance, "performing procedures to assess the risks of material misstatement of the consolidated financial statements," and "examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements." *Id.* PwC also explained that it "conducted [its] audits of the[] consolidated financial

8

statements in accordance with the standards of the" Public Company

Accounting Oversight Board ("PCAOB"). *Id.*

Based on the "test[s]" and "procedures" it performed through its

audits, PwC presented the following conclusion in its audit opinion:

> In our *opinion*, the consolidated financial statements present
> fairly, in all material respects, the financial position of the
> Company as of December 31, 2017 and December 31, 2016,
> and the result of its operations and its cash flows for each of
> the two years in the period ended December 31, 2017 in
> conformity with accounting principles generally accepted in
> the United States of America.

*Id.* (emphasis added).

### Bloom Energy Later Revises 2016 And 2017 Financial Statements And Restates 2018 And 2019

More than a year after the IPO, Bloom Energy changed how it

accounts for a type of contract known as a Managed Services Agreement

("MSA"). 3ER 524-26 ¶400. An MSA is a type of sale-leaseback

contract that Bloom Energy employs when selling Energy Servers to

customers. 3ER 438-39 ¶¶81-82; 3ER 524-26 ¶400. Under an MSA,

Bloom Energy first sells the Energy Servers to a bank, which in turn

leases the equipment back to Bloom Energy, which then subleases the

equipment to a customer. 3ER 438 ¶81; 3ER 524-26 ¶400. Through

this arrangement, Bloom Energy acts as both a lessee (vis à vis the

9

bank) and a lessor (vis à vis the customer). 3ER 438 ¶81; 3ER 524-26 ¶400. Bloom Energy then enters into a service contract with the customer, under which the customer covers the cost of Bloom Energy's lease payment to the bank and additionally pays Bloom Energy to service the Energy Server. 3ER 438 ¶81; 3ER 524-26 ¶400.

There are two ways to account for these types of sale-leaseback arrangements. 3ER 439 ¶83. One way is to treat them as a sale subject to an "operating lease," such that Bloom Energy accounts for the revenue it earns as an initial lump sum when it sells the Energy Server to the bank. 3ER 439-40 ¶¶83, 86. The other is to classify MSAs as a financing subject to a "capital lease," such that Bloom Energy accounts for the revenue it earns in installments from the customer over the course of the service agreement. *Id.*

Before 2019, Bloom Energy classified MSAs as sales subject to operating leases. 3ER 524-26 ¶400. Bloom Energy was transparent in the Registration Statement about how the MSAs' sale-leaseback arrangement operated. 2ER 330. The Registration Statement explicitly disclosed that an MSA may be "classified as a capital lease or an operating lease" and that Bloom Energy decided to classify them as

operating leases. *Id.* It also explained how this classification affected Bloom Energy's recognition of its revenues and liabilities. *Id.* PwC's audit of Bloom Energy's 2016 and 2017 financial statements did not identify any issue with classifying MSAs as operating leases under GAAP. *See* 3ER 524-26 ¶400.

In late 2019, while reviewing a particular MSA that had just closed, Bloom Energy reevaluated its MSAs and decided to reclassify certain MSAs as capital leases. 3ER 525 ¶400. To reflect that reclassification, in February 2020, Bloom Energy "revised" its 2016 and 2017 financial statements and "restated" its 2018 and 2019 financial statements.[1] 3ER 524-26 ¶¶400-02. There is a stark difference under SEC guidance: A restatement corrects a *material* error in prior financial statements, whereas a revision corrects an error that is "immaterial to the prior year financial statements." SEC Staff Accounting Bulletin No. 108, 71 Fed. Reg. 54,580, 54,582 (Sept. 18, 2006).

---

[1] In addition to revising the 2016 and 2017 financial statements, Bloom Energy also revised its 2018 Q1 financial statements. For simplicity, this brief refers to the restatements as covering 2018 and 2019, even though that treatment did not start until Q2 of 2018.

Bloom Energy explicitly embraced this distinction. It explained that it treated the changes to the financial statements for 2016 and 2017 as a revision because it considered the changes "not material to warrant restatement of reported figures," per SEC guidance. 3ER 528-30 ¶412; 3ER 524-26 ¶400. In contrast, it conceded that the changes had "material impacts to [its] financial statements" for the later years. 3ER 526 ¶401. The difference matters here, because the only financial statements PwC audited in connection with Bloom Energy's Registration Statement were revised, not restated. Yet Plaintiffs repeatedly ignore the critical distinction, falsely asserting that the financial statements PwC audited were subsequently "restated." *E.g.*, OB2-3, 13-15, 53-54, 65.

### *Plaintiffs Sue Numerous Entities Involved In Bloom Energy's Public Offering*

This case against PwC is the last gasping vestige of a sprawling, and largely unsuccessful, litigation. Plaintiffs launched this class action suit in 2019, before Bloom Energy made the revision at issue here (and the restatements). Plaintiffs sued Bloom Energy and nine of its current or former officers or directors (collectively, "Bloom Energy Defendants"), as well as ten underwriters of Bloom Energy's IPO

("Underwriter Defendants"). PwC was not a defendant in Plaintiffs'
original complaint *or* their First Amended Complaint.

Plaintiffs asserted claims under Section 10(b) of the Securities
Exchange Act of 1934 ("Exchange Act"), based on numerous alleged
misstatements Bloom Energy made from 2018 to 2019. SER 244-80
¶¶93-260. Those statements related to topics such as:

- construction delays that Bloom Energy allegedly
  misrepresented or failed to disclose;

- more than $2 billion in contingent liabilities that Bloom
  Energy allegedly failed to disclose; and

- approximately $130 million in replacement costs that Bloom
  Energy allegedly failed to disclose.

SER 244-61 ¶¶93-169. The complaint alleged that multiple drops in
stock price—one more than 40%—occurred when disclosures concerning
Bloom Energy's contingent liabilities and other news about the original
Defendants' alleged misstatements came to light. SER 274-76 ¶¶239-
42. Plaintiffs also asserted claims under Section 11 of the Securities
Act for alleged misstatements in the Registration Statement. SER 235-
43 ¶¶38-82. None of Plaintiffs' sprawling allegations against the Bloom
Energy Defendants and Underwriter Defendants involved the
classification of Bloom Energy's MSAs.

13

Almost a year into the litigation, Bloom Energy announced the restatements of its 2018 and 2019 financial statements that it deemed material, along with the revisions of its 2016 and 2017 financial statements that it deemed immaterial. 3ER 524-26 ¶400. The next day, Bloom Energy's stock price dropped 13.8%. 3ER 527 ¶404. Plaintiffs amended their complaint again to encompass those developments, in the now-operative Second Amended Complaint. The overwhelming focus of that complaint—more than a hundred of its 136 pages—remains the original Section 10(b) allegations against certain Bloom Energy Defendants. 3ER 449-553 ¶¶134-508. But the complaint adds some ancillary Section 10(b) and Section 11 allegations regarding Bloom Energy's classification of the MSAs, including allegations that the classification affected three line-items in the financial statements— revenue, net loss, and net loss per share—for each of three years (2017, 2018, and 2019). *See, e.g.*, 3ER 455-59 ¶¶161-72. Even on that topic, the complaint puts primacy on the audit years that were not covered in Bloom Energy's Registration Statement: 2018 and 2019. It observes that the treatment of the MSAs for 2018 and 2019 misstated the challenged line-items by as much as 17.3%, 3ER 487-88 ¶279, an effect

that Bloom Energy acknowledged to be material, 3ER 526 ¶401. By comparison, the complaint alleges that the line-items for 2017—the only year relevant to Plaintiffs' Section 11 claim against PwC—were misstated by only 2.8% to 5.0%. 3ER 441-42 ¶90.

The complaint concedes that the classification of the MSAs under GAAP depended on a judgment about the length of the Energy Servers' "useful life." 3ER 441 ¶89. Under Accounting Standards Codification ("ASC") 840-10-25-1, an MSA qualifies as a capital lease if "[t]he lease term is at least 75% of the property's [i.e., the Energy Servers'] estimated remaining economic life." 3ER 439-40 ¶84. Plaintiffs allege that the lease terms were 6-10 years. 3ER 441 ¶89. They further allege that Bloom Energy estimated that the Energy Servers' useful lives was 15-21 years, 3ER 542 ¶469, which would have put the ratio comfortably under the 75% threshold (as the worst case would be 10/15 = 67%). But Plaintiffs allege that the actual useful lives were "much shorter" (though they do not specify just how much shorter). 3ER 542 ¶469; *see* 3ER 441 ¶89. With that shorter lease term, Plaintiffs claim that the 75% rule required a capital lease classification. 3ER 441 ¶89; 3ER 542 ¶469.

15

Given PwC's limited role as outside auditor, it is no surprise that the complaint mentions PwC only a few times in passing and does not attribute any alleged misstatements specifically to PwC. Instead, the complaint lumps PwC with the "Section 11 Defendants" that Plaintiffs assert "assisted Bloom Energy … in preparing their financial statements for the IPO" and "were responsible for the contents and dissemination of the Registration Statement." 3ER 427 ¶37; 3ER 448 ¶¶116-18. The complaint does not allege that PwC was responsible for any particular aspect of the Registration Statement. It vaguely asserts that PwC was "liable … for the actionable statements and omissions in the Registration Statement" because it "purported[]" to have "conducted an adequate and reasonable investigation into the business, operations, financial statements, and accounting of Bloom Energy." 3ER 448 ¶116.

**The District Court Grants PwC's Motion To Dismiss**

The Bloom Energy Defendants and Underwriter Defendants moved to dismiss all claims against them, SER 149-212, and PwC filed a separate motion to dismiss the Section 11 claims against it, SER 213-29. The bulk of the district court's decision focused on Plaintiffs' claims against the Bloom Energy Defendants and Underwriter Defendants,

16

narrowing the case significantly. We summarize the relevant portions of those rulings below, but start with the limited portion of the court's opinion granting PwC's motion to dismiss in its entirety.

***Claims against PwC.*** Because Plaintiffs mainly argued that PwC was liable for the statements in its one-page audit opinion, that was the main focus of the court's ruling relating to PwC. 1ER 25-29. The court correctly concluded that PwC's audit opinion is an inactionable opinion under *Omnicare*. Specifically, the audit opinion expressed the *opinion* that Bloom Energy's financial statements "present fairly, in all material respects, the financial position of the Company … in conformity with" GAAP. 1ER 27 (quoting 2ER 313). In this regard, the court noted the audit opinion's statement that the "financial statements are the responsibility of [Bloom Energy's] management," while PwC's "responsibility is to *express an opinion* on [Bloom Energy's] consolidated financial statements based on [its] audits." *Id.* The court also reiterated that the proper classification of the MSAs is a "complex" matter that "may require the exercise of considerable judgment," 1ER 27-28, thus further underscoring why PwC was not liable for any statements in the audit opinion.

17

The court then rejected Plaintiffs' argument that the otherwise-inactionable opinions were nevertheless actionable under two of the *Omnicare* exceptions.  1ER 28-29.  In particular, the court rejected Plaintiffs' argument that PwC's opinions contained within them, as "embedded statements of fact," the financial statements prepared by Bloom Energy.  1ER 28.  It held that the argument was "premised on a misinterpretation of *Omnicare.*" *Id.*

Next, the court rejected a theory that appears nowhere in the complaint, but that Plaintiffs advanced for the first time in opposition to PwC's motion to dismiss: that Section 11(a)(4) makes PwC liable for *Bloom Energy's* financial statements—separate and apart from any liability PwC may have for its audit opinion—because, according to Plaintiffs, PwC "certified" Bloom Energy's financial statements.  *Id.*  As the court explained, PwC's "certification" was not a guarantee that the financial statements were entirely accurate, but rather was limited to the conclusions presented in PwC's audit opinion.  *Id.*

***Other Defendants.***  The district court partially granted and partially denied the Bloom Energy Defendants' and Underwriter Defendants' motions to dismiss.  1ER 37.  As relevant here, the court

18

held that the three line-items in Bloom Energy's financial statements that depended on classification of MSAs were themselves inactionable opinions.  1ER 13-17.  The court reasoned that the applicable GAAP provisions "appear[] to involve complex considerations of the specific terms of the MSAs and the value of the Energy Servers."  1ER 16-17.

In particular, the court highlighted that the Energy Servers' useful economic life was a "necessary input to determine" the MSAs' classification, yet Plaintiffs did not explain how that is a purely objective determination, or why it "does not require the exercise of judgment."  *Id.*  In fact, the complaint "did not specify the economic life of an Energy Server," except to acknowledge that Bloom Energy "represented that the Energy Servers had useful lives of 15 to 21 years." 1ER 17 (citing 3ER 542 ¶469).  Of course, that range would imply that the alleged lease term of 6-10 years was *less than* 75% of the Energy Servers' estimated economic life, thereby refuting Plaintiffs' claim of an actionable accounting error.  *Id.*  For those reasons, the court dismissed Plaintiffs' claim against the Bloom Energy Defendants and Underwriter Defendants premised on the restatements and revisions of Bloom Energy's MSAs.  *Id.*  The court sustained only a few of Plaintiffs' claims

against the Bloom Energy Defendants and Underwriter Defendants based on allegations about, for instance, construction delays, which had nothing to do with PwC.  1ER 22-24.

*Leave to amend.*  Having dismissed the bulk of Plaintiffs' claims, the district court granted Plaintiffs leave to amend.  1ER 37.  Plaintiffs chose not to amend, however, conceding that "amendment … would be futile."  SER 65; *see also* SER 50.  Instead, they moved for entry of final judgment as to PwC.  SER 50-51.  Because the court's ruling was not a final order, and proceedings against many other Defendants continued, the court denied entry of final judgment as to PwC.  SER 56-61.  Plaintiffs eventually settled their claims against the remaining Defendants.  SER 4-48.  The district court subsequently entered final judgment dismissing all claims against PwC.  1ER 3.

## SUMMARY OF THE ARGUMENT

**I.**  Under Section 11, outside auditors like PwC are responsible for the audit opinions they issue in connection with registration statements.  Section 11(a)(4) does not make them strictly liable for every line-item in the financial statements that *issuers* prepare and publish in their registration statements.

20

The Act's text and implementing regulations limit PwC's liability to the contents of its audit opinion. Unlike other Section 11 defendants, accountants, functioning as outside auditors here, can be sued only "with respect to the statement … which purports to have been prepared or certified by him," 15 U.S.C. § 77k(a)(4), not the *issuer's* statements. And while Plaintiffs here focus on what PwC "certified," that same provision also distinguishes "prepar[ing]" a financial statement from "certify[ing]" one. The SEC defines "certified" to "mean[] examined and reported upon with an *opinion.*" 17 C.F.R. §§ 230.405, 210.1–02(f) (emphasis added). And PCAOB standards spell out the stark division of labor: "The financial statements are management's responsibility" and "[t]he auditor's responsibility is to express an *opinion* on the financial statements" they audit. PCAOB AS 1001.03 (emphasis added).

Thus, the statements an accountant certifies under Section 11(a)(4) are constrained by the scope of the certification— whether it contains facts, opinions, or a mix of both. Where, as here, an accountant has "certified" the underlying statements by expressing an audit opinion, any liability can arise only from the statements in the audit opinion. And that liability, in turn, is subject to the strict limits

21

the Supreme Court prescribed in *Omnicare* as to when opinions are actionable.  Any other rule would be fundamentally incompatible with the necessarily limited nature of audits—and threaten to upend the carefully constructed role of outside auditors established by the Act.

No circuit has ever extended auditor liability beyond the audit opinion.  And the Second Circuit has correctly rejected such an extension, on the ground that it would be inconsistent with *Omnicare*. *See Querub v. Hong Kong*, 649 F. App'x 55, 58 (2d Cir. 2016).  Plaintiffs' effort to argue otherwise is based on distorted accounts of cases that never even address the subject.  Having tried, and failed, to satisfy *Omnicare*, Plaintiffs cannot evade the district court's unappealed ruling by asserting now that they never had to satisfy *Omnicare* because Section 11 makes PwC—and every other independent auditor—liable for every line-item in a registration statement, regardless of what the audit opinion says.

**II.**  Apart from the axiom that PwC is responsible only for *its* audit opinion, PwC cannot be liable for the three challenged line-items in *Bloom Energy's* Registration Statement, for two independent reasons.

**A.** First, the district court correctly held that the three line-items are themselves inactionable opinions, because the MSAs' proper accounting treatment depends on a complex and inherently subjective estimate of the useful life of Energy Servers.

Plaintiffs are flatly wrong to urge a categorical legal rule that numerical line-items, such as revenue, can never be opinions. Under *Omnicare*, a statement is an "opinion" if it is based on "inherently subjective and uncertain assessments." 575 U.S. at 186. No court has recognized any categorical exception to that rule for numbers. As this Court has acknowledged, numerical line-items can sometimes be facts and sometimes be opinions, depending on whether they require the exercise of judgment.

Plaintiffs also cannot overcome the district court's conclusion that these particular line-items entailed subjective judgments. To start, Plaintiffs fail to address the district court's conclusion that they forfeited this argument by not mentioning in their opposition the GAAP provision on which they now base their argument. Regardless, Plaintiffs are also wrong in characterizing the provision as a "very clear bright line provision[]." OB53 (quoting 3ER 439-40 ¶84). GAAP says it

23

requires "estimat[ion]" for good reason. 3ER 439 ¶84 (ASC 840-10-25-1). This particular estimate, the expected useful life of Energy Servers, depends on multiple complicated and judgment-bound factors. Here, again, the district court faulted Plaintiffs for failing even to "specify the economic life of an Energy Server" in their complaint. 1ER 17. Having declined to amend, Plaintiffs cannot overcome their forfeiture by pointing out that the complaint estimated the life of a *different* replaceable component, not the Energy Servers themselves.

**B.** This Court can also affirm on the independent alternative ground that the challenged line-items in Bloom Energy's 2017 financial statements were not material, as a matter of law, for two complementary reasons. First, the change in classification of the MSAs was immaterial to the financial statements; it was a *revision*, not a *restatement*. Plaintiffs allege that the misclassification caused Bloom Energy to overstate its 2017 revenue by 2.8% and understate various net loss measurements by 4.7% to 5.0%, whereas SEC guidance deems deviations of 5% or less presumptively immaterial. And Plaintiffs allege no facts—quantitative or qualitative—that overcome the presumption. Indeed, Plaintiffs rely on numerous mischaracterizations

24

of their own complaint in an effort to support this argument. Second, Plaintiffs further fail to establish materiality because the Registration Statement supplied sufficient disclosures such that the revision did not change the total mix of information available to investors.

This Court should affirm.

## ARGUMENT

### I.  Section 11(a)(4) Does Not Impose Strict Liability On Accountants For The Issuer's Financial Statements.

Plaintiffs have executed a remarkable jump from a position that is just plain meritless to one that is both radical and meritless. Before the district court, Plaintiffs focused primarily on *PwC's* audit opinion, asserting that it contained material misrepresentations or omissions sufficient to avoid dismissal under *Omnicare*. *See* SER 111-13; OB56-57. Unable to satisfy *Omnicare*, Plaintiffs now abandon a claim of liability based on "alleg[ations] that PwC's audit opinion … contained misrepresentations that were actionable pursuant to § 11." OB55 n.7. Instead, they ask this Court to adopt an extreme view that no other court of appeals has adopted in the Act's 90-plus-year history—that outside auditors are strictly liable, under Section 11(a)(4), for the issuer's line-items in the registration statement. Specifically, Plaintiffs

seek to hold PwC strictly liable for three out of the scores of line-items that *Bloom Energy* reported in its 2017 financial statements, and that PwC neither prepared nor repeated in its audit opinion.

Plaintiffs' reading of Section 11 is wrong. The Act's text and interpreting regulations limit PwC's liability to the contents of its audit opinion, recognizing the historical and practical limitations on the accountant's role. § I.A. Nothing in the legislative history or structure of the Act overrides those explicit statutory and regulatory terms. § I.A. As the only relevant circuit authority has held, Plaintiffs' reading also flouts *Omnicare*. § I.B.

## A. The Act's text and interpreting regulations limit PwC's liability to what it "certified"—its audit opinion.

**1.** Section 11(a)(4) provides that "any person acquiring [a] security" pursuant to a registration statement "may … sue" "every accountant, … or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration." 15 U.S.C. § 77k(a)(4). But not everything in the registration statement exposes an accountant to liability. Accountants can be sued only "with respect

26

to the statement … which purports to have been prepared or certified by him." *Id.* This Court has long read this provision as authorizing suits "only as to those portions of the statement that purport to have been prepared or certified by the accountant." *Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir. 1994).

This limitation is unique to the parties described in Section 11(a)(4). Consequently, Section 11 treats accountants (and similar professionals) differently from all "other Section 11 defendants," who may be sued for "any and all … misstatements or omissions within a registration statement." *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 498 (S.D.N.Y. 2018) (internal quotation marks omitted); *see Monroe*, 31 F.3d at 774. Section 11(a)(1), for instance, provides that "every person who signed the registration statement" is subject to liability, and it does not limit that liability to particular portions of the registration statement. 15 U.S.C. § 77k(a)(1). Likewise, Section 11(a)(3) provides that "every person … named in the registration statement as being … a director … or partner" of the issuer is subject to liability, also without limiting the scope of liability. *Id.* § 77k(a)(3).

There is a second, related limitation in Section 11(a)(4): It distinguishes "prepar[ing]" a financial statement from "certify[ing]" one. The provision makes this explicit by holding accountants and other professionals liable only for the statements that they "purport[] to have … prepared *or* certified." *Id.* § 77k(a)(4) (emphasis added).

The Act further confirms Congress's intention to convey that what a person "certifies" depends on the nature of the certification. Congress recognized that a certification is often very limited. For instance, the Act requires certain investor transactions to be accompanied by "a statement *certified* by [the] seller that they have *no reasonable grounds to believe* that the issuer is in violation of the securities laws or regulations." *Id.* § 77d(d)(3)(K) (emphasis added). What the seller certifies there is not full accuracy or complete assurance that a fact is true, but the absence of information to form a belief about that fact. So too in Section 11(a)(4), the statements an accountant "certifie[s]" under that provision are necessarily constrained by the scope of the certification—whether it comprises facts, opinions, or a mix of both.

The regulations recognize, and reinforce, all these statutory limitations and attributes—the meaning of "certify," how it differs from

28

"prepare," and the importance of focusing on what exactly is certified—especially as they relate to accountants. To start, SEC regulations define "[t]he term certified, when used in regard to financial statements, [to] mean[] examined and reported upon with an *opinion* expressed by an independent public or certified public accountant." 17 C.F.R. §§ 230.405, 210.1–02(f) (emphasis added). They also starkly distinguish an accountant's "certification" from "preparation" of the financial statements in the first instance: An accountant who *prepares* a financial statement is disqualified from serving as an independent accountant authorized to *certify* the statement. *See id.* § 210.2–01(c)(4)(i) ("An accountant is not independent if … the accountant provides" "non-audit services to an audit client," such as by "[p]reparing the audit client's financial statements.").

The same lessons are evident in the PCAOB's standards, which have the force of regulations. *See* 15 U.S.C. § 7213(a)(1), (a)(3)(B) (PCAOB "shall, by rule, establish" auditing standards subject to SEC approval); *id.* §§ 78s(b), 7217(b)(4) (requiring notice-and-comment procedures for such SEC approval); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 485 (2010).

29

First, PCAOB standards require the auditor to state in the audit opinion that "[t]he financial statements are management's responsibility" and that "[t]he auditor's responsibility is to express an *opinion* on the financial statements" it audits. PCAOB AS 1001.03 (emphasis added); *see* PCAOB AS 4101.01; *see Fehribach v. Ernst & Young LLP*, 493 F.3d 905, 910 (7th Cir. 2007) ("audited company's financial statements … are prepared by the company, not by the auditor") (Posner, J.).

Second, PCAOB regulations absolve auditors of the obligation to conduct the sort of exhaustive examination that would be necessary for them to assume responsibility for the truth of every assertion in the financial statements. The PCAOB is clear that "[a]bsolute assurance is not attainable because of the nature of audit evidence and the characteristics of fraud." PCAOB AS 1015.10. Rather, the PCAOB requires auditors to obtain "reasonable assurance" that the reviewed "financial statements are free of material misstatements." *Id.*; *see Deephaven Priv. Placement Trading, Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1175 (10th Cir. 2006); Alvin A. Arens, et al., *Auditing and Assurance Services* 169 (16th ed. 2017). Toward that end, auditors are

not required to gather all evidence, but only evidence "sufficient appropriate audit evidence." PCAOB AS 1105.04. Moreover, an audit does not test or analyze every line-item in the financial statements but rather "selective[ly] test[s] … the data being audited, which involves judgment regarding both the areas to be tested and the nature, timing, and extent of the tests to be performed," PCAOB AS 1015.11; *see* PCAOB AS 1105.22, 2810.02.

Several conclusions flow from these statutory and regulatory distinctions. First, the regulations confirm—and direct independent accountants to inform investors about—the stark division of labor between the issuer, who "prepares" the financial statements, and the accountant, who "certifies" them with an audit opinion. Second, as a matter of law, the accountant's certification expresses an opinion, not an endorsement of every fact reported in a financial statement. *See United States v. Arthur Young & Co.*, 465 U.S. 805, 811 (1984) (accountants carry out their auditing role by "issu[ing] an *opinion*" as to the state of the audited company's financials (emphasis added)). The accountant may extend its certification to encompass or vouch for specific facts. But the audit's primary objective is to "examine[] and

31

report[] upon" the issuer's financial statements "with an opinion." 17 C.F.R. §§ 230.405, 210.1–02(f). Third, the certification confirms only that the accountant has conducted testing to provide reasonable assurance that there are no material misstatements but disclaims responsibility for guaranteeing the truth of any fact reported in the financial statements. "[T]he auditor certifies only that it exercised appropriate, not flawless, levels of professional care and judgment." *In re Ikon Office Sols., Inc.*, 277 F.3d 658, 673 (3d Cir. 2002).

The consequence of these principles is that an independent accountant's liability must be based on *what* its certification conveys. Where, as here, an accountant has "certified" the underlying statements by expressing an audit opinion, rather than "preparing" them or attesting to their accuracy, any liability must arise from the statements in the audit opinion and not from the issuer's financial statements. Notably, Section 11(a)(4) imposes liability only when an accountant "has with his *consent* been named as having prepared or certified any part of the registration statement," and even then, only "with respect to the statement … which *purports* to have been prepared or certified by" the accountant. 15 U.S.C. § 77k(a)(4) (emphasis added). PwC

32

consented to the use of only its one-page audit opinion—nothing more—in the Registration Statement.  *See* 3ER 387.  And PwC's liability for the statements in its audit opinion, in turn, is subject to the strict limits the Supreme Court has prescribed in *Omnicare* as to when opinions are actionable.  *See infra* § I.B.

**2.**  These statutory and regulatory principles reflect the necessary practical limitations on the role of an independent auditor, especially as compared to the issuer.  The issuer, not the auditor, "operate[s] the business daily"; the issuer's "management knows more about [the issuer's own] transactions and related assets, liabilities, and equity than the auditor."  Arens, et al., *supra*, at 168.  For instance, Bloom Energy is far better situated to assess its Energy Servers' useful economic life, the issue that gave rise to the disputed accounting in this case.  *Supra* 15, 19, 24.  "In contrast, the auditor's knowledge of these matters and internal control is limited to that acquired during an audit."  Arens, et al., *supra*, at 168.  Even the most diligent audit "does not guarantee that a client's accounts and financial statements are correct any more than a sanguine medical diagnosis guarantees well-being."  *Ikon*, 277 F.3d at 673; *see Deephaven*, 454 F.3d at 1174

33

("[A]uditors do not 'certify' a company's financial statements in the sense that they 'guarantee' or 'insure' them." (footnote omitted)); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 560-61 & n.16 (N.D. Cal. 2009) ("[A]n audit opinion is not a guarantee that the financial statements are entirely without error nor an exact science."). Auditors thus do not, "by virtue of auditing a company's financial statements, somehow make, own or adopt the assertions contained therein." *Deephaven*, 454 F.3d at 1174.

Any legal rule inconsistent with an audit's necessary limitations would radically transform audits—making them prohibitively expensive if not altogether unviable. *See* Br. of Amicus Curiae American Institute of Certified Public Accountants § III. "If auditors were responsible for making certain that all the assertions in the [financial] statements were correct, the types and amounts of evidence required and the resulting cost of the audit function would increase to such an extent that audits would not be economically practical." Arens, et al., *supra*, at 169; *see Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 399 (1992) (in bank) ("[T]he auditor cannot in the time available become an expert in the client's business and record-keeping systems.").

34

Moreover, the audit opinion "is the final product of a complex process involving discretion and judgment on the part of the auditor at every stage." *Bily*, 3 Cal. 4th at 400. Accountants apply professional judgment to analyze the issuer's financial statements in light of various inputs, including legal authorities and information the issuer furnishes. *See, e.g.*, *Arthur Young*, 465 U.S. at 811-12. Among the assessments the accountant must make are how to apply GAAP standards, which "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979); *see Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995) ("GAAP 'do[es] not necessarily parallel economic reality.' Financial accounting is not a science." (citation omitted)).

**3.** Plaintiffs do not even try to reconcile their reading of Section 11(a)(4) with the statutory text, regulations, or practical limitations on audits. They argue that an independent accountant who "certifies" an issuer's financial statements with an audit opinion is just as liable under Section 11 for those financial statements as the issuer and anyone else who "prepared" them. OB39-42. Plaintiffs fail to account for: (1) the statutory distinction between those two words; (2)

35

the regulatory definition of "certif[y]" as expressing an "opinion"; or (3) the PCAOB's requirement that the auditor state the division of labor between "management[]" and the accountant, PCAOB AS 1001.03; *see* PCAOB AS 4101.01.

Nor do Plaintiffs confront how their reading of Section 11(a)(4) would override PCAOB standards charging auditors with the role of "selective[ly] testing … the data being audited," PCAOB AS 1015.11, to assess whether "evidence obtained is sufficient and appropriate," PCAOB AS 2810.02. Plaintiffs demand that auditors provide absolute assurance of a financial statement's accuracy, while ignoring the PCAOB's directive that auditors provide only "reasonable assurance" that the reviewed "financial statements are free [from] material misstatement[s]," or the PCAOB's caution that "[a]bsolute assurance is not attainable." PCAOB AS 1015.10.

**4.** Plaintiffs try to invoke Section 11's legislative history to overcome the statutory and regulatory language. OB21-33. But legislative history cannot override, or even "muddy," plain statutory language. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). And in any event, Plaintiffs' effort depends on a distortion of

36

the legislative history. The passages they cite show only that Congress intended to impose strict liability on "the *issuing corporation*" and "the signers *on behalf of the corporation*" in a way that differed from the scienter-based liability under common-law fraud (and later the Exchange Act). OB21-33 (quoting 2ER 76) (emphasis added). Plaintiffs do not quote a word of legislative history saying that *independent auditors* are subject to strict liability for statements they did not make. Nor that Congress intended Section 11 to be especially "severe" or "stringent" *toward independent auditors*. *E.g.*, OB17, 21, 23, 28, 29.

Plaintiffs also find no support in Section 7(a), OB25-26, which requires an accountant to certify the "balance sheet of the [issuer's] assets and liabilities." 15 U.S.C. § 77aa(25). It does not specify what form the accountant's certification must take. For that, the federal regulations and PCAOB standards discussed above supply the answer: It must be "an opinion," 17 C.F.R. § 230.405, based on evidence that supplies "reasonable assurance" that the financial statements are not materially misstated. PCAOB AS 1015.10.

In the end, Plaintiffs' theory is an exercise in statutory revision and regulatory denialism.

37

**B.** *Omnicare* **and Section 11 caselaw reject Plaintiffs' "certification" theory.**

**1.** The only circuit to address Plaintiffs' novel theory flatly rejected it. *See Querub*, 649 F. App'x 55 (2d Cir. 2016). There, the plaintiffs made the same argument Plaintiffs make here, that "auditors [are] responsible [under Section 11] for false statements … in the financial statements they have certified," not just false statements in their audit opinions. Opening Brief at 55-56, *Querub*, No. 15-2100, Doc. 103; *see* Reply Brief at 21-23, *Querub*, No. 15-2100, Doc. 140. The Second Circuit held that the accountant could be held liable only for misstatements, if any, in its audit opinion. It reasoned that "[a]udit reports, labeled 'opinions' and involving considerable subjective judgment, are statements of opinion subject to the *Omnicare* standard for Section 11 claims." 649 F. App'x at 58.

The Second Circuit correctly rejected the more expansive view of auditors' Section 11 liability as flatly inconsistent with *Omnicare*. Under *Omnicare*, an independent accountant's liability under Section 11 is generally limited to the accountant's *opinions* about the issuer's financial statements. *Omnicare* explains that opinions are different from statements of fact. "A fact is a thing done or existing,"

38

while "[a]n opinion is a belief [or] view." *Omnicare*, 575 U.S. at 183 (cleaned up). "[A] statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Id.* Thus, for instance, prefacing a statement with "I believe" or "I think" "transforms [a] factual statement into one of opinion" because it "expresse[s] … a view, not a certainty." *Id.* at 183-84 (emphasis omitted). The same goes for "inherently subjective and uncertain assessments." *Id.* at 186. Even if "an investor can ultimately prove [those assessments] wrong," that "does not allow investors to second-guess" or "Monday morning quarterback" what are, at bottom, "opinions." *Id.*

As discussed, Section 11(a)(4), its implementing regulations, and PCAOB standards make clear that what an independent accountant "certifie[s]" is "an opinion" about the issuer's financial statements, 17 C.F.R. §§ 230.405, 210.1–02(f), based on audit procedures aimed to obtain "reasonable assurance," PCAOB AS 1015.10 (not certainty). The accountant conveys this through an audit opinion that is expressly labeled—and legally required to be labeled—an "opinion." The opinion typically emphasizes multiple caveats (as PwC's did here) about the

accountant's belief and the limits of its inquiry. Under *Omnicare*, that "inherently … uncertain assessment[]," couched in the express language of "belief," is plainly subject to the rules governing opinions rather than assertions of fact. 575 U.S. at 183, 136. The district court thus was correct in holding that "the *Omnicare* framework applies to PwC's statements in its audit report." 1ER 28.

An auditor's opinions are not insulated from liability under that framework. Investors can challenge accountants over their audit opinions, as Plaintiffs did below (but not on appeal). Under *Omnicare*, an opinion can still be a material misstatement and give rise to liability under Section 11 in three circumstances, where: (1) "the speaker did not hold the belief she professed" and the belief is objectively untrue; (2) the opinion contains false "embedded statements of fact"; or (3) the opinion omits facts "whose omission makes the opinion … misleading." 575 U.S. at 185-86, 194; *see City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017).

The district court rejected Plaintiffs' effort to cram PwC's actual statements into two of these exceptions. 1ER 27-28. Plaintiffs cannot evade that unappealed ruling by asserting now that *Omnicare* is

40

entirely irrelevant, and that they never had to demonstrate any *Omnicare* exception because Section 11 makes accountants liable for every line-item in the financial statements of a registration statement, irrespective of their audit opinions. OB39-40.

Plaintiffs contend that this maneuver is necessary to prevent auditors from avoiding liability through the mere "semantic choice" to label their statements as opinions. OB59 (quoting *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 399 (S.D.N.Y. 2013)). But auditors have no "choice"; they are legally required to label their audit report as an "opinion." Moreover, Plaintiffs' argument is directly contrary to the Supreme Court's decision in *Omnicare*. Under *Omnicare*, a statement's precise wording is not just "semantic[s]." It is consequential: A statement that "[t]he TVs we manufacture have the highest resolution available on the market" may be a statement of fact, but the company "transforms that factual statement into one of opinion" by saying "'I *believe*' (or 'I think') 'the TVs we manufacture have the highest resolution available on the market.'" 575 U.S. at 183. That is, "the words 'I believe' themselves … preclud[e] liability for an untrue statement of *fact*." *Id.* at 184 (emphasis added).

41

Plaintiffs are also wrong to argue that treating PwC's audit opinion as an opinion under *Omnicare* "negates any role for the due diligence defense expressly provided to auditors in § 11(b)(3)." OB59. The due-diligence defense absolves Section 11 defendants (other than the issuer) from liability if "after reasonable investigation," they have "reasonable ground to believe and did believe ... that the statements" they made were not materially false or misleading. 15 U.S.C. § 77k(b)(3). That defense still applies to any statements of *fact*; *Omnicare* merely makes the defense unnecessary for opinions. Accountants or other professionals listed in Section 11(a)(4) can still raise the due-diligence defense as to any of their statements of fact, as PwC would have done had Plaintiffs identified any. Besides, Plaintiffs' argument goes too far: If accepted, it would mean that *Omnicare* is fundamentally inconsistent with the due-diligence defense, since nothing about Plaintiffs' argument is unique to accountants.

**2.** Multiple district courts have agreed with the Second Circuit's view that Section 11 plaintiffs must meet *Omnicare's* requirements before an audit opinion is actionable. These courts reject the notion that an accountant is strictly liable under Section 11 for the issuing

42

company's financial statements, as opposed to statements in the audit opinion.  In *Johnson v. CBD Energy Ltd.*, No. CV H-15-1668, 2016 WL 3654657 (S.D. Tex. July 6, 2016), for example, the plaintiffs attempted to advance the very argument Plaintiffs make here:  that even if the statements in an audit opinion are pure opinions, an independent accountant is "strictly liable" for the issuer's "'underlying … financial statements'" due to the accountant's "certification" of them.  *Id.* at *10. The court roundly rejected that argument, explaining that the "certification" does not imply that the accountant is "responsible for [the issuer's] financial statements as statements of fact," but rather merely holds the accountant potentially liable for its "audit report."  *Id.* at *11 (internal quotation marks omitted).  *Johnson* thus correctly understood that an accountant's certification is only its audit opinion, not the issuer-prepared financial statements.  *See also In re Velti PLC Sec. Litig.*, No. 13-CV-03889-WHO, 2015 WL 5736589, at *15-24 (N.D. Cal. Oct. 1, 2015) (finding accountant not liable under Section 11 for misstatements in the "audit reports and the accompanying financial statements" because accountant offered only opinions protected under *Omnicare*); *Charles Schwab*, 257 F.R.D. at 560 ("the only relevant

statement attributed to PwC was its audit opinion," notwithstanding PwC's "certification" of financial statements).

Plaintiffs principally rely on a single post-*Omnicare* decision that no other court has followed. *See Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109 (E.D. Cal. 2017). That court, however, failed to grapple with any of the points made above regarding how Section 11 and the controlling regulations treat accountants differently from issuers, or how they treat certifying differently from preparing statements. Worse, the district court premised its holding on the false notion that "certify" must mean to affirm the accuracy of the financial statements, 243 F. Supp. 3d at 1117, without noticing the regulations that reject that definition.[2]

Even less relevant is the pre-*Omnicare* district-court opinion Plaintiffs tout, holding that a "certification" is "an audit affirming the

---

[2] In passing, Plaintiffs also cite (OB40 n.4) the post-*Omnicare* decision *In re Lehman Bros. Sec. & ERISA Litig.*, 131 F. Supp. 3d 241 (S.D.N.Y. 2015). But the court there found it "difficult to imagine what Congress might have meant by an accountant's certification if not [an] auditor's *opinions*," which "express[] the view that the issuer's financial statements fairly present the issuer's financial position and the results of its operations—*as distinguished from 'affirm[ing] the [] accuracy' of the financial statements.*" *Id.* at 260 (emphasis added).

accuracy" of the issuer's financial statements. *OSG*, 971 F. Supp. 2d at 400. *OSG* conflicts with the Second Circuit's subsequent opinion in *Querub*. Indeed, the plaintiffs in *Querub* urged the Second Circuit to follow *OSG* to conclude that the independent accountant in that case was liable for the issuer's financial statements, Opening Brief at 55-56, *Querub*, No. 15-2100, Doc. 103, and the Second Circuit categorically rejected *OSG*.

**3.** The other Section 11(a)(4) cases Plaintiffs cite are irrelevant. OB40-42. *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407 (9th Cir. 1994), decided only the narrow issue whether an independent accountant established as a matter of law, on summary judgment, a loss causation defense. *Id.* at 1423. Contrary to Plaintiffs' claim, this Court did not hold that the independent accountant is "the only defendant potentially liable for the errors contained in the company's financial statements." OB40-41. Plaintiffs seem to base that false assertion on a passing reference in dicta to an accountant's certification. 35 F.3d at 1421. But this Court did not decide the merits of how certification might affect an independent accountant's liability. This Court pointed out that neither it nor the court below decided whether there were any

45

actionable misstatements. *Id.* at 1423; *see In re Worlds of Wonder Sec. Litig.*, 814 F. Supp. 850, 866-67, 874-78 (N.D. Cal. 1993) (deciding only accountant's loss-causation defense).

Even further afield is *In re Software Toolworks Inc.*, 50 F.3d 615 (9th Cir. 1994). Plaintiffs seem to find it relevant that the district court there concluded that the independent auditor was not entitled as a matter of law to the due-diligence defense. *See id.* at 620. But that holding has nothing to do with the Section 11(a)(4) issue here. In fact, this Court explained that the plaintiffs had "dropped their [last] remaining section 11 claim … against" the auditor before the district court could determine the auditor's liability. *Id.*

With no persuasive authority to support their position, Plaintiffs point to Supreme Court cases that note the importance of "the public … *perceiv[ing]* [an issuer's financial statements] as being accurate," or note that accountants have a "heavy" "moral responsibility to the public." OB30-31, 39 (internal quotations marks omitted). But "recogniz[ing]" that "an accountant who audits a public company's financial statements has … a special '*public* responsibility,'" does not change the simple truth that "auditors do not 'certify' a company's

46

financial statements in the sense that they 'guarantee' or 'insure' them." *Deephaven*, 454 F.3d at 1174. To hold that these precatory observations make auditors liable for the *issuer's* statements of fact would (again) subvert *Omnicare*.

* * *

Stated simply, Plaintiffs' interpretation of Section 11(a)(4) would dramatically subvert the liability scheme that Congress established for the independent auditor. Because PwC's certification was limited to its audit opinion, PwC can only be liable for the statements in that audit opinion if Plaintiffs meet *Omnicare's* standards. Having abandoned any effort to plead liability under *Omnicare*, Plaintiffs' Section 11 claim fails.

## II. The Challenged Line-Items In Bloom Energy's Financial Statements Are Inactionable Opinions.

As a matter of law, and as an independent basis for affirming, the three line-items on which Plaintiffs attempt to establish liability are not actionable for two independent reasons. First, the district court correctly concluded that Plaintiffs failed to adequately plead that the challenged line-items are statements of fact; it found them to be opinions (and therefore inactionable because Plaintiffs neither pled nor

47

argued any of the *Omnicare* exceptions). § II.A. Second, Plaintiffs failed to plead facts showing the revisions to the line-items to be material. § II.B.

### A. The challenged line-items are inactionable opinions based on highly subjective assessments of Energy Servers' useful life.

In the proceedings below, Plaintiffs focused all their energy on arguing that they adequately pled that the line-items were facts, not opinions. SER 128-35. They neither pled nor argued (and still do not argue) that they satisfied an *Omnicare* exception. SER 128-35. Because the district court correctly held that, as pled, the three challenged line-items are opinions, 1ER 13-17, this Court should affirm.

The court reasoned that "Bloom's treatment of the MSAs and its recognition of revenue from them was the product of accounting judgments." 1ER 14. This accounting determination "involve[s] complex consideration[]" of various GAAP provisions and how they map onto "the specific terms of the MSAs and the value of the Energy Servers." 1ER 16-17. The court discussed at length the GAAP criteria for determining how to treat the MSAs, focusing mostly on the criterion Plaintiffs emphasize here: "whether the lease term is at least 75% of the

48

Energy Server's estimated economic life." 1ER 17; *see also* 3ER 439 ¶84 (ASC 840-10-25-1). And the court concluded that Plaintiffs' sparse allegations "have not established" that criterion because of several gaps and legal defaults. 1ER 17.

Plaintiffs challenge the district court's ruling that the line-items are opinions on two bases: (1) the categorical legal argument that numerical line-items, such as revenue, can never be statements of opinion and are always statements of fact, OB44-52; and (2) case-specific arguments that the complaint here adequately alleged that those line-items were statements of fact, OB52-54. The district court correctly rejected both.

> ### 1. Numerical line-items can be opinions when based on inherently subjective accounting judgments.

Plaintiffs' lead argument on appeal is that "statements of revenue, net loss, and net loss per share contained within a company's financial statements"—and, evidently, any other number on "a company's balance sheet or income statements"—can never be opinions because they are always statements of fact. OB44-45. The district court was

correct to reject that argument, because it is legally and logically unsound.

Under *Omnicare*, a statement is an "opinion" instead of a "fact" when it is based on "inherently subjective and uncertain assessments." 575 U.S. at 186. Neither *Omnicare* nor any other case has recognized a categorical exception to that rule for numbers. The district court correctly applied this principle to conclude that numbers can sometimes be facts and sometimes be opinions, depending on whether "the considerations underlying these figures—such as which GAAP provisions apply and how to apply them— … require the exercise of judgment." 1ER 14.

Quoting liberally from another precedent, the district court gave examples of numerical statements on each side of the opinion/fact line. On one side of the line are situations where "'the numbers underlying the data consist only of figures that were then presently known, fixed, or definite—*e.g.*, the price of widgets and number of widgets sold in a particular month.'" *Id.* (quoting *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545, 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019), *rev'd on other grounds*, *New England Carpenters Guaranteed Annuity &*

*Pension Funds v. DeCarlo*, __ F.4th __, 2023 WL 11965444 (2d Cir. 2023), throughout this paragraph). There, "'any resulting data would be a statement of fact.'" *Id.* On the other side of the line are situations where, as here, "'the relevant accounting guidance called for the exercise of judgment,'" in which case "'the resulting data would be a statement of opinion.'" *Id.* In short, while "[o]ne might initially *think* that nothing could be more straightforwardly a statement of 'fact' than a company's statement of … revenue on a financial statement," in fact "accountancy … consists of more than counting beans." *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 666 (D.N.J. 2021) (emphasis added).

As the district court recognized, just because a statement is expressed numerically does not mean it was derived only with objective inputs and without any subjective assessment. If it did, an estimate could never be an opinion. For example, if a climate expert estimated that climate change inflicts $143 billion dollars of damage per year, *see* Rebecca Newman & Ilan Noy, *The Global Costs of Extreme Weather that are Attributable to Climate Change*, Nature Communications (2023), at 3, that is an opinion, regardless how precise the numerical measure

purports to be. That is because such an estimate is indisputably based on subjective judgments about numerous factors.

Numerous cases confirm the district court's view that there is no categorical rule excepting numerical line-items from *Omnicare*'s analysis. For instance, that is the commonsense approach this Court took in *Align*, 856 F.3d at 613. There, the district court rejected the plaintiffs' claim that various figures in financial statements—including "total assets" and "net profit[s]"—were false statements of fact. *Id.* at 612-13. The court concluded that those figures were opinions because they depended on "inherently subjective" goodwill valuations. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 65 F. Supp. 3d 840, 847-48, 850 (N.D. Cal. 2014). This Court noted that the plaintiffs did not challenge this holding and it "s[aw] no reason to conclude otherwise." 856 F.3d at 613.

As this Court noted, *id.*, the Second Circuit adopted "identical reasoning" in *Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011). *Fait* held that certain line-items expressed as numbers in financial statements were "subjective" opinions. *Id.* at 111, 113. It reasoned that the figures depended "not [on] matters of objective fact"

but rather on judgments that "vary depending on the particular methodology and assumptions used." *Id.* at 110-11.

Another good illustration is *AmTrust*, the case that the district court below quoted at length. Like here, the plaintiffs there sued over "revenue and income figures." *AmTrust*, 2019 WL 4257110, at *14, *16. The court concluded that those figures were opinions whenever "they involve inputs that reflect 'subjective judgments,' rather than those that are 'objectively determinable.'" *Id.* at *15; *see id.* at *17-18. Likewise, *Ortiz* concluded that "revenue statements" were opinions because "[t]he governing accounting principles" in that case "ma[d]e clear that *valuations* of … revenue … 'are inherently subjective.'" 537 F. Supp. at 666 (quoting *Align*, 856 F.3d at 613). Several other courts have reached the same conclusion regarding a variety of numerical line-items in financial statements. *See, e.g.*, *Chapman v. Mueller Water Prods., Inc.*, No. 19-cv-3260, 2020 WL 3100243, at *10 (S.D.N.Y. June 11, 2020) ("warranty reserves"); *Pirnik v. Fiat Chrysler Autos., N.V.*, No. 15-CV-7199, 2016 WL 5818590, at *8 (S.D.N.Y. Oct. 5, 2016) ("recall reserves").

Contrary to Plaintiffs' assertion, OB52, the Second Circuit did not retreat from its position in *Fait*—much less adopt Plaintiffs' categorical

rule—on appeal of *AmTrust*. The Second Circuit explained that a statement is not *automatically* deemed a "subjective judgment" *just because* it applies "GAAP standards" that "are subject to misreading, misinterpretation, or misapplication." *New England Carpenters*, 2023 WL 11965444, at *10. But that passage recognizes that there is no categorical rule about the treatment of numbers—they can be either opinions or statements of fact.[3]

Plaintiffs are also incorrect in arguing (OB19, 44) that the challenged line-items are statements of fact because they are not explicitly labeled as opinions. Every case discussed above found line-items to be opinions even though none were labeled opinions. *See, e.g.*, *Ortiz*, 537 F. Supp. 3d at 667 (inventory and revenue statements

---

[3] Plaintiffs also misapprehend the Second Circuit's opinion in suggesting that the court "reversed" *AmTrust*'s holding that numbers can be opinions. OB52. The Second Circuit upheld that analysis: It agreed that some of the challenged numbers—revenues recognized from certain extended-warranty contracts—were "statements of opinion." *New England Carpenters*, 2023 WL 11965444, at *8-10. It reversed only on the next step of the analysis, finding that the opinions were nevertheless "actionable" under an *Omnicare* exception. *Id.* at *10. As to the rest of the numbers, the court expressly stated that it "d[id] not need to decide whether" they "are statements of fact or … statements of opinion," for the same reason. *Id.* at *11.

deemed opinions despite lacking words like "'I believe'"); *Align*, 65 F. Supp. 3d at 847-48, 850; *Fait*, 655 F.3d at 111, 113; *AmTrust*, 2019 WL 4257110, at *14-18. That is because reasonable investors do not need magic words to appreciate that financial accounting can involve subjective judgments. *See, e.g.*, *Thor*, 439 U.S. at 544 (GAAP "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management"). Reasonable investors are capable of ascertaining which numbers are facts and which are opinions by reading the financial statements alongside the issuer's numerous required disclosures about *how* it determines those figures. *See* 17 C.F.R. §§ 210.1–01, 229.10 (Regulations S-X and S-K require issuers to disclose derivation of financial statements).

Plaintiffs are also mistaken that treating some numerical statements as opinions improperly imports a "scienter requirement" into Section 11. OB48-49. Section 11 eliminates a scienter requirement only for statements of *fact* that are materially false or misleading. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). But Plaintiffs do not dispute that Section 11 liability is subject to *Omnicare*'s requirements for opinions. The conclusion that a statement

55

reflects an opinion under *Omnicare* is not an improper "scienter requirement." OB48. One does not examine the speaker's state of mind in determining whether a particular analysis depends on fundamentally subjective factors.

Beyond these arguments, Plaintiffs only cite a few irrelevant opinions. They all predate *Omnicare* as well as this Court's opinion in *Align*—some by decades. Regardless, none of them suggests the categorical rule Plaintiffs advance. For instance, *Worlds of Wonder* did not find "that misstatements of revenue were misstatements of fact," much less adopt a rule that they always are. OB46. This Court did not address whether the allegedly false financial statements were opinions or facts. Rather, as discussed above (at 45-46), it decided only whether statutory defenses were available to certain Section 11 defendants. 35 F.3d at 1421-23; *see also Software Toolworks*, 50 F.3d at 620 (mentioning district court's holding regarding auditor's statutory defense, but noting that the plaintiffs dropped the claim before appealing).

Similarly, none of Plaintiffs' other cases addressed whether the line-items in question were facts or opinions—and none involved a

dispute as to what GAAP itself required under the circumstances. *See SEC v. Todd*, 642 F.3d 1207, 1217 (9th Cir. 2011) ("[r]egardless" what "compliance with GAAP" entailed, jury could determine that the defendant materially misled investors); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1019 (9th Cir. 2005) (discussing a claim that defendant was clearly "in violation of GAAP," regardless of any potential complexity that might be involved); *Provenz v. Miller*, 102 F.3d 1478, 1484 (9th Cir. 1996) ("defendants do not appear to dispute plaintiffs' contentions" regarding revenue accounting "under GAAP").

In sum, neither law nor logic supports Plaintiffs' proposed categorical rule.

> ### 2. The challenged line-items are opinions because they require complex and subjective accounting judgments.

Plaintiffs' backup argument is that "the District Court was incorrect to conclude that accounting for the MSAs as operating leases involved the exercise of subjective judgment and complex considerations." OB52. The district court correctly concluded that the argument is forfeited multiple times over, as well as inconsistent with the relevant accounting guidance and the facts as pled.

Plaintiffs start with ASC 840-10-25-1, the GAAP provision that classifies a lease as a capital lease when "[t]he lease term is at least 75% of the property's estimated remaining economic life." OB53. Plaintiffs observe that the complaint describes ASC 840-10-25-1 as a "very clear bright line provision[]." OB53 (quoting 3ER 439-40 ¶84). But Plaintiffs forfeited that argument below. The district court pointed out that Plaintiffs' opposition brief "d[id] not even reference ASC 840-10-25-1." 1ER 16. The district court also held: "Nor d[id] [Plaintiffs] explain why the application of this provision does not require the exercise of judgment." *Id.* Plaintiffs are stuck with that forfeiture ruling because they have not challenged it on appeal.

Regardless, the district court correctly concluded that the application ASC 840-10-25-1 entails "complex considerations" and "the exercise of considerable judgment." 1ER 16, 27-28. As the court noted, a "necessary input" into the rule was a prediction about the future expected useful life of pieces of hardware, Energy Servers. 1ER 17. Contrary to Plaintiffs' assertion on appeal, "the estimated life" of Energy Servers is not a "known or knowable objective fact[]." OB53. The GAAP provision itself indicates that this factor is subjective by

58

calling it an "estimate[]." 3ER 439 ¶84 (ASC 840-10-25-1). Estimating useful life depends on multiple complex and subjective factors, such as how you measure expected life, where and how you use the hardware, how you define "useful," how technological refinements improve on past performance, among others. This appeal confirms that the assessment is subjective. On the one hand, Defendants have been consistent throughout this litigation that the Energy Servers had a useful life of 15 to 21 years. 1ER 17; *see* 3ER 441 ¶89; 3ER 542 ¶469; SER 90, 174. On the other hand, Plaintiffs insist on appeal that the Energy Servers' useful life was "five years and possibly shorter." OB10.

Of course, what matters on this motion to dismiss is what is in Plaintiffs' *complaint*, not their appellate brief. And on that front, the district court found yet another forfeiture: "In the complaint, Plaintiffs do not specify the economic life of an Energy Server." 1ER 17. "[T]he only insight Plaintiffs provide is that Bloom represented that the Energy Servers had useful lives of 15 to 21 years." *Id.* As discussed, Plaintiffs alleged lease terms of 6-10 years; so even the lower boundary of the 15-to-21-year estimate acknowledged in the complaint would

have comfortably satisfied the 75% rule (since the worst-case scenario would be 10/15 = 67%). *Supra* 15.

Here, again, Plaintiffs declined to fill the gap, when they conceded that an "amendment … would be futile." SER 65. Instead, Plaintiffs now challenge the forfeiture ruling on appeal with a blatantly false assertion about the allegations in their complaint. They claim that two paragraphs of their complaint "clearly allege[] that Bloom Energy's servers had useful lives of no more than five years." OB38 (citing 3ER 435-37 ¶¶75-76). Plaintiffs' oppositions below never said this either. SER 109-11, 128-30. And for good reason: Those two paragraphs have nothing to do with the useful life of Energy Servers. Instead, they are about "*Fuel Cell* Life." 3ER 435. Plaintiffs' complaint admits the critical difference: "[F]uel cells" are the "replace[able]" components "that *go inside* the Energy Servers." 3ER 432 ¶64 (emphasis added). Invoking those allegations here is like insisting that the useful life of a smoke detector is one year because that's how long the batteries last.

As a last resort, Plaintiffs attempt to cast the fact that Bloom Energy revised the line-items as "evidence that they were initially objectively incorrect." OB53-54. The district court correctly rejected

that as a non sequitur: "[O]pinion statements can still be wrong such that a company may seek to correct them." 1ER 16-17. As *Omnicare* acknowledges, an opinion can "turn[] out to be wrong," but that "will not alone give rise to liability"—there must also be proof that the defendant did not believe it to be true. 575 U.S. at 186. It follows from *Omnicare* that correcting a statement of opinion does not somehow transform it into a statement of fact. As the district court pointed out, "Plaintiffs do not cite any case law" otherwise. 1ER 17.

## B. The revisions to the line-items were not material.

The challenged line-items are also not actionable because Plaintiffs did not plead facts demonstrating them to be "material," as required under Section 11. 15 U.S.C. § 77k(a), (a)(4). A "misrepresentation [i]s immaterial … if it would not have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 278 (2014) (internal quotation marks omitted); *see In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794 (9th Cir. 2017). Although the district court had no need to reach the issue, this Court is free to decide it as an independent and alternative ground for

affirmance. That is particularly appropriate because "[b]oth parties have briefed the question" and this Court "need only read the complaint." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 927 (9th Cir. 2023), *cert. granted sub nom. NVIDIA Corp. v. Ohman J*, 144 S. Ct. 2655 (June 17, 2024).

While materiality can be a factual issue in some cases, Plaintiffs ignore that courts regularly reject materiality on the pleadings— especially where, as here, the complaint teeters on the shaky foundation of "conclusory allegations of law and unwarranted inferences." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108-11 (9th Cir. 2010); *see, e.g.*, *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1407 (9th Cir. 1996) (same); *Xu v. Gridsum Holding Inc.*, No. 18 Civ. 3655, 2020 WL 1508748, at *9 (S.D.N.Y. Mar. 30, 2020) (Section 11 claim based on restated financial statements dismissed on materiality grounds). "'[R]easonable minds could not differ'" on materiality here, *Stac*, 89 F.3d at 1405, for two reasons. First, the revisions were too insignificant—quantitatively and qualitatively—to be material. Second, any error was immaterial when viewed alongside other disclosures in the Registration Statement. Each deficit independently warrants dismissal, but the combination strongly

compels dismissal. That is why Bloom Energy classified its changes to the challenged 2017 line-items as revisions rather than restatements—contrary to Plaintiffs' persistent false assertions that they were "restatements." *See supra* 11-12 (explaining that per SEC guidance, a revision is impermissible for material changes); 12 (citing Plaintiffs' repeated mischaracterizations). And that is presumably why the SEC never challenged that designation.

1. The complaint presents a chart that confirms, in the most concrete numerical terms, how trivial the revisions to the three challenged 2017 line-items were:

- total revenue was 2.8% worse than reported
- net loss was 4.7% greater than reported (and "net loss attributable to common stockholders" was 5.0% greater)
- "net loss per share attributable to common stockholders" was 5.0% greater than reported

3ER 441-42 ¶90; *see* OB14.

SEC guidance establishes that understatements of 5% or below are presumptively immaterial as a matter of law. SEC Staff Accounting

63

Bulletin ("SAB") No. 99, 64 Fed. Reg. 45,150, 45,151 (Aug. 19, 1999).[4]

Specifically, SAB No. 99 endorses the "rule of thumb" that "a deviation

of less than" a "numerical threshold … 5% … with respect to a

particular item on the [issuer's] financial statements is unlikely to be

material." *Id.* "SAB No. 99 … [is] persuasive authority," *ECA, Loc. 134*

*IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d

187, 198 (2d Cir. 2009), as Plaintiffs themselves confirm by invoking the

same SAB, OB63; 3ER 441-42 ¶90. Courts thus have frequently applied

the 5% presumption in SAB No. 99 at the pleading stage, when holding

that minor errors in financial statements are immaterial as a matter of

law, and thus inactionable. *See, e.g.*, *IBEW Loc. Union No. 58 Pension*

*Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783

F.3d 383, 391 (2d Cir. 2015) (applying SAB No. 99 in concluding that

alleged misstatement worth "less than 4% of … total asset backed

securities exposure" is immaterial at pleading stage); *JP Morgan*, 553

F.3d at 204-05 (applying SAB No. 99 in concluding that certain

---

[4] "A Staff Accounting Bulletin is a periodic publication from the SEC
that offers 'interpretive guidance' regarding how the SEC thinks
GAAP's broad principles (as well as applicable SEC rules and
regulations) should be applied." *SEC v. Jensen*, 835 F.3d 1100, 1110 n.5
(9th Cir. 2016).

"relatively small" errors in financial statements are immaterial at pleading stage); *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19 CIV. 7536, 2021 WL 1199035, at *20 (S.D.N.Y. Mar. 30, 2021) (certain alleged errors "would not clear the 5% presumptive immateriality threshold"), *aff'd*, 54 F.4th 82 (2d Cir. 2022); *In re Ply Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 153 (S.D.N.Y. 2015) (certain alleged errors "would fall below SAB No. 99's 5% threshold").

Plaintiffs keep trying to inch one figure—"net loss per share"—past the 5.0% threshold. Plaintiffs argued below that their complaint's reference to "5.0%" reflected a "math error" and the real number should be 5.*2*%. SER 111. And now, in a footnote, they notch it up to 5.3%. OB62 n.8 (citing 3ER 441-42 ¶90). Neither 5.2% nor 5.3% appears in the complaint. Plaintiffs are bound by the 5.0% they pled: "In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Broam v. Bogan*, 320 F.3d 1023, 1026 (9th Cir. 2003). That rule carries

65

particular force here, where Plaintiffs insisted that "amendment …
would be futile."  SER 65; *supra* 20.

Thus, because Plaintiffs here allege a revision of 5.0% for some
figures, and much less for others, this Court must begin with the
presumption that any error was not material.  *JP Morgan*, 553 F.3d at
204 ("[T]he five percent numerical threshold is a good starting place for
assessing the materiality of the alleged misstatement.").

Plaintiffs fail to overcome the presumption of immateriality.  They
quote SAB No. 99's list of relevant qualitative factors, but make only
the most perfunctory pretense at applying them.  OB63-64.  For
instance, Plaintiffs merely repeat their assertion that "accounting for
the MSAs were precise measurements and *not estimates*," to invoke the
factor whether "the misstatement arises from an item capable of precise
measurement or … an estimate."  OB63-64 (emphasis added) (quoting
64 Fed. Reg. 45,152).  But Plaintiffs are manifestly incorrect that
accounting for the MSAs was a precise measurement, for reasons
already explained—and GAAP directly contradicts Plaintiffs by calling
the accounting treatment an "estimate[]."  *Supra* 58-59.  Without
elaboration, Plaintiffs also mention another qualitative factor: whether

"'the misstatement masks a change in earnings.'" OB63. But Plaintiffs do not argue that the factor applies here, much less that it overcomes the presumption of immateriality. Nor could they. The classification of MSAs did *not* cover up any hidden change to Bloom Energy's bottom-line earnings. Rather, it affected which quarter the revenues from MSAs appeared on Bloom Energy's balance sheets. As the complaint notes, Bloom Energy made clear when it announced its corrections that the "timing of the Company's revenue recognition for the Impacted MSAs will change," but that change in *timing* "does not impact cash" or "the economic terms or substance" of the MSAs. 3ER 524-26 ¶400.

Plaintiffs next claim that the revision was material because MSAs "play[ed] a significant role in [Bloom Energy's] operations or profitability," purportedly "constitut[ing] 8% … of Blooms' business in 2017." OB63-64 (quoting 64 Fed. Reg. 45,151). But they offer no citation to the complaint. Nor do they explain how that lone figure satisfies the factor, especially when that figure is already baked into the quantitatively immaterial revisions. Regardless, courts have held that this single qualitative factor does not overcome the presumption of immateriality. *See, e.g.*, *Royal Bank of Scotland*, 783 F.3d at 391 (even

67

where a misstatement concerned "a driving factor in [the company's] profitability, this factor alone does not tip the scales in favor of finding the misstatements material"); *see also Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385, 403 (S.D.N.Y. 2022) (three qualitative factors "do not tip the scales towards materiality").

Plaintiffs also broadly assert that materiality can be gleaned from the fact that Bloom Energy's stock price dropped "when these errors were disclosed." OB65. They ignore that Bloom Energy simultaneously published *all* corrections to its financial statements from 2016 through 2019—the restatements to the 2018 and 2019 financial statements explicitly labeled "material" as well as the revisions to the 2016 and 2017 financial statements deemed "immaterial." 3ER 524-26 ¶¶400-02. Plaintiffs have not alleged that they can tie the "market's response" to the "immaterial" 2017 revisions—the only corrections relevant to the claim against PwC. OB65. Thus, Bloom Energy's stock drop says nothing about the alleged materiality of the limited 2017 revisions. *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011) (rejecting argument that stock-price drop demonstrated materiality, where the "[company's] press releases were loaded with news (largely

very bad), any item of which could have caused [company's] stock price to drop"). In fact, SAB No. 99 emphasizes that very point, warning that "[c]onsideration of potential market reaction to disclosure of a misstatement is by itself 'too blunt an instrument to be depended on' in considering whether a fact is material." 64 Fed. Reg. 45,152; *see Hutchison*, 647 F.3d at 490 (noting that the Second Circuit has expressly "adopted" this "warning in SAB No. 99"); *JP Morgan*, 553 F.3d at 205 (adopting SAB No. 99's warning).

Finally, Plaintiffs incorrectly assert that "any adjustment to previously issued historical financial statements is an admission that the previously issued financial statements contained *material* errors." OB65 n.10 (emphasis added). Obviously, correcting an error says nothing about whether the error was material. *See* 71 Fed. Reg. 54,582 (not every correction is material). And there is no way to imply a supposed "admission" when Bloom Energy explicitly stated that the revision for 2017 was "immaterial … to [its] financial statements." 3ER 526 ¶401; *see* 3ER 524-26 ¶400.

**2.** Plaintiffs' failure to overcome the presumption of immateriality is compounded by the Registration Statement's other disclosures that

complete the financial picture. *See, e.g.*, *McCormick v. Fund Am. Cos.*, 26 F.3d 869, 881 (9th Cir. 1994) (finding an alleged misrepresentation "not material in light of the disclosure which was made"). The surrounding statements provide crucial context to foreclose Plaintiffs' claim.

Plaintiffs' materiality argument depends on their view that Bloom Energy's classification of the MSAs led Bloom Energy to recognize revenue upon the "sale" of the Energy Servers at the outset when it should have recognized the revenue over the term of the MSA. But the Registration Statement fully explained the MSAs' classification as operating leases and the impact on Bloom Energy's financial statements: It described the MSAs, how they were classified and accounted for, and how they were valued. *See, e.g.*, 2ER 330 ("The Company is a party to master lease agreements that provide for the sale of Energy Servers to third-parties and the simultaneous leaseback of the systems, which the Company then subleases to its customers."); *id.* ("[T]he Company determines if the leaseback is classified as a capital lease or an operating lease."); *id.* ("The Company's managed services arrangements are classified as operating leases."); *see also* 2ER 173,

70

218. And it explained that with the MSAs classified "[a]s operating leases, [Bloom Energy] recognizes a portion of the net revenue, … and defers the portion of net revenue and cost of sale that represents the gross profit that is equal to the present value of the future minimum lease payments over the master leaseback term." 2ER 330; *see also supra* 10-11. Put another way, the Registration Statement explained the impact of the MSAs' classification on "net revenue," "cost," "present value," and "gross profit." This detailed explanation of the MSAs and their accounting was more than sufficient to allow investors to assess the effect of the MSAs on Bloom Energy's financial statements.

More broadly, the Registration Statement was also clear that Bloom Energy "incurred significant net losses" "since [its] inception in 2001," and that it "anticipate[s] that [it] will incur net losses on a GAAP basis for the foreseeable future." 2ER 116. It documented an accumulated deficit of about $2.3 billion, and net losses of hundreds of millions of dollars per year. 2ER 116, 212. In the face of projections of chronic losses well into the future, the slight increase in the size of the net loss (or other slight inaccuracies) does not change the total mix of information available to investors. Plaintiffs' "'[c]onclusory allegations

71

of law and unwarranted inferences'" thus provide no basis on which a reasonable juror could find the revision material. *Atossa*, 868 F.3d at 794; *Stac*, 89 F.3d at 1407 (same).

These disclosures thus reinforce Plaintiffs' failure to overcome the presumption of immateriality.

**3.** These two factors together distinguish this case from the other cases Plaintiffs cite in support of materiality. Although Plaintiffs claim to identify cases finding misstatements of less than 5% to be material, *see* OB64, they overstate—or in some cases, misstate—what those cases held. For instance, *Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000), did not find a 2% misstatement material, as Plaintiffs claim. Rather, the Second Circuit concluded that the misstatements were in the range of *8% to 17.7%*. *Id.* at 164-66. In another case, the court concluded a misstatement might be material due to significant qualitative factors absent here. *See Knox v. Yingli Green Energy Holding Co.*, 242 F. Supp. 3d 950, 972 (C.D. Cal. 2017) ("[D]espite [the] negligible impact on [the company's] total assets," there was a "significantly larger" impact "within the Chinese market" that "a reasonable investor may have found" "important" because the company

72

was "undergoing a major shift … to China."). And *United States v. Hawkins*, No. CR 04-106, 2005 WL 1660984 (N.D. Cal. July 11, 2005), is a wholly inapposite decision involving the dismissal of a criminal indictment. *Id.* at *19, *24-25.

In sum, "dismissal of the complaint on materiality grounds is appropriate," because the revision is presumptively immaterial, the complaint offers at most "'[c]onclusory allegations of law and unwarranted inferences'" as to materiality, and other disclosures demonstrate the revision's *immateriality*. *Atossa*, 868 F.3d at 794.

## CONCLUSION

This Court should affirm the district court's dismissal of the complaint.

Respectfully submitted,

*/s/ E. Joshua Rosenkranz*

| | |
|---|---|
| Edward Williams | E. Joshua Rosenkranz |
| ORRICK, HERRINGTON & | Eliza Lehner |
|   SUTCLIFFE LLP | Jodie C. Liu |
| 2100 Pennsylvania Ave., NW | ORRICK, HERRINGTON & |
| Washington, DC 20037 |   SUTCLIFFE LLP |
| | 51 West 52nd Street |
| | New York, NY 10019 |
| | (212) 506-5000 |

*Counsel for Defendant-Appellee*

73

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 24-3568

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/E. Joshua Rosenkranz                **Date** Nov. 25, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-3568

I am the attorney or self-represented party.

**This brief contains 13,941 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs;
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/E. Joshua Rosenkranz      **Date** Nov. 25, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*